IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| SAMANTHA G. JENNINGS, | ) | CIVIL ACTION 4:04-2169-JFA-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| JO ANNE B. BARNHART | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I.  PROCEDURAL HISTORY

The plaintiff, Samantha G. Jennings, filed applications for disability insurance benefits on October 22, 2001, alleging inability to work since October 14, 1999 (Tr. 36-38), due to lateral meniscus tears in both knees, chondromalacia, trochanter bursitis in both hips, fibromyalgia, cubital tunnel syndrome, and ulnar nerve subluxing (Tr. 55).  Her applications were denied at all administrative levels  and upon reconsideration (Tr. 24-33).   Following a hearing held on August

11, 2003 (Tr. 298-334), the ALJ issued a decision on January 23, 2004 (Tr. 12-19), finding plaintiff was not disabled because she had the residual functional capacity (RFC) to perform a range of sedentary[1] work and could perform other work existing in significant numbers in the regional or national economies (Tr. 16-19).  The Appeals Council denied plaintiff's request for review on April 28, 2004, thereby making the ALJ's decision the Commissioner's final decision for purposes of judicial review under 205(g) of the Act.  See 20 C.F.R. § 404.981.

## II.  FACTUAL BACKGROUND

The plaintiff, Samantha G. Jennings, was born March 3, 1967 (Tr. 36), and was 36 years old at the time of the ALJ's decision.   Plaintiff has the equivalent of a high school education, a GED, and has worked in the vocationally relevant past as an exterminator, telemarketer, auto parts salesperson, route salesperson, restaurant manager, house cleaner, grocery store price integrity specialist and grocery store assistant department manager (Tr. 65).

## III.  DISABILITY ANALYSIS

The plaintiff's arguments consist of the following:

(1)     The ALJ incorrectly determined that plaintiff's allegations of disabling pain and limited functional capacity were not credible because plaintiff's allegations are supported by the majority of medical and testimonial evidence in the record.

(Plaintiff's brief).

_____

[1]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a)(2004).

In the decision of January 23, 2004, the ALJ found the following:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial activity since the alleged onset of disability.

3.      The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.      The claimant has the residual functional capacity to perform sedentary exertional level.

8.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

9.      The claimant is a "younger individual" (20 CFR § 404.1563).

10.     The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

11.     Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.29 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Tr. 13-19).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence[2] and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a (1988). An ALJ must consider (1) whether the claimant is engaged in substantial

---

[2]Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

4

gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act. 42 U.S.C. § 423 (d)(5). She must make a prima facie showing of disability by showing she was unable to return to her past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

5

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.

## IV. MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case. The medical records as set out by the defendant have not been disputed by the plaintiff. Therefore, the undisputed medical evidence as stated by the defendant is set forth herein.

On October 14, 1999, plaintiff presented to the Lexington Medical Center Emergency Department with complaints of left knee pain following an incident in which she twisted her knees while working as an exterminator. Robert D. Mearns, M.D., examined plaintiff and found she was an alert and interactive obese woman in no acute distress. She had tenderness in her knee, but no acute effusion, erythema, or crepitus. An x-ray revealed no bony injury. Dr. Mearns assessed internal derangement of the left knee, prescribed Tylox for pain, and gave plaintiff a knee immobilizer and crutches. He directed her to follow up with her orthopaedist (Tr. 98-99).

On October 18, 1999, plaintiff presented to the orthopaedist Barry D. Oliver, M.D., for evaluation of her left knee injury. Plaintiff reported pain in both knees, left worse than right. She indicated her pain worsened with prolonged standing and walking. Dr. Oliver found she had severe pain in her left knee on direct palpation and considerable tenderness with any attempted flexion

6

greater than 10 degrees.  She also had medial joint line tenderness on direct palpation of her right knee.  Dr. Oliver assessed possible meniscal pathology of both knees and suggested an MRI. (Tr. 103).

An MRI of the left knee was performed on November 4, 1999, which revealed chondromalacia of the medial facet of the patella and a posterior horn medial meniscal tear (Tr. 106).

On November 11, 1999, plaintiff presented to the Moore Orthopaedic Clinic for evaluation of her knee pain.  Plaintiff stated she was taking Vioxx (anti-inflammatory medication) and denied having any significant difficulties with her knees, but stated "s[he] ha[d] a sense of [them] giving way".  Orhtopaedist Deanna L. Constalbe, M.D., noted plaintiff's weight at 246 pounds.  Dr. Constable found mild effusion in the left knee and diffuse tenderness to light touch.  She did not detect any gross instability.  Radiographs showed plaintiff had bilateral knee strains with patellofemoral symptoms.  Dr. Constable noted plaintiff's history of injury was "somewhat unusual to produce bilateral meniscal tears" and recommended continuing conservative treatment.  She prescribed a neoprene knee sleeve, instructed plaintiff in home exercises, and ordered physical therapy.  Dr. Constable opined, "[i]n terms of work, I certainly feel that it is safe for [plaintiff] to return to work with a light duty status.  This includes sedentary type duties with limited walking and no squatting or stooping" (Tr. 181-182).

Plaintiff returned to Dr. Constable for a followup visit on December 2, 1999.  She reported nothing had worked well and stated she had been unable to tolerate Vioxx.  Plaintiff stated she took as many as 16 Advil for pain per day.  On examination, plaintiff appeared to have less irritability in her knees, her patellae were "more easily mobile," and her range of motion was "virtually full."  Dr. Constable found persistent discomfort but no instability.  She discussed the possibility of surgery

7

with plaintiff.  Dr. Constable noted that plaintiff's current employer did not have any light duty jobs available.  She therefore requested plaintiff remain "off work" (Tr. 179).

On December 10, 1999, plaintiff presented to Robert M. Peele, M.D., of Midlands Orthopaedics for an evaluation of her knee pain.  On examination, her right knee had range of motion from zero to 122 degrees, with crepitus and tenderness.  Her left knee had range of motion from zero to 110 degrees, with crepitus and tenderness.  McMurray's sign was positive.  X-rays showed the patellae were laterally postured, and an MRI suggested a posterior tear.  Dr. Peele found she had meniscal tears bilaterally and patellofemoral dysfunction.  He recommended left knee arthroscopy and stated plaintiff could not work in pest control at the present time (Tr. 211-212).

On December 22, 1999, plaintiff underwent arthroscopic left knee surgery by Dr. Peele (Tr. 209-210).

At a followup visit on December 28, 1999, plaintiff had a range of motion from zero to 90 degrees and could perform a straight leg-raising test.  One of Dr. Peele's associates, Thomas P. Gross, M.D., adjusted her medications and encouraged her to progress with her exercises (Tr. 208).

From January 7, 2000, through March 24, 2000, plaintiff had several followup appointments with Dr. Peele.  Plaintiff is complaining of pain in both knees and that using crutches has aggravated her right elbow lateral epicondylitis.  Dr. Peele adjusted her medications, gradually worked to take her off crutches, and noted she needed to begin a water aerobics program (Tr. 201-207).

On March 3, 2000, plaintiff told her psychiatrist, David Downie, IV, M.D., who had been treating her since October, 1998, that she was sleeping a little better, and that Prozac had been helpful (Tr. 222, 225).

On June 16, 2000, Dr. Peele directed plaintiff to continue water aerobics and do straight leg-raising exercises.  He noted her right elbow was bothering her somewhat, and that she wore a splint (Tr. 198).

On July 14, 2000, Dr. Peele noted plaintiff's right knee was "doing well," and that her left knee was persistently causing pain and a sense of giving way.  He noted she had been discharged from vocational rehabilitation because "they can't help her."  Dr. Peele offered repeat arthroscopy of the left knee (Tr. 197).

Plaintiff underwent another arthroscopic surgery on the left knee on August 9, 2000.  Dr. Peele found she had a small additional tear of the mesial border of the medial meniscus, focal meniscal tibial surface malacia, broad-based malacia of the medial femoral condyle, and central stable malacia of the patella with an insignificant chondral loose body (Tr. 194-195).

Plaintiff was referred to Dr .Ugino for right elbow pain. Plaintiff saw Dr. Ugino on November 13, 2000.  Plaintiff reported pain in her right elbow, numbness and tingling in her right ring and little fingers, and weakness in her right hand.  Plaintiff reported that a tennis elbow strap helped with her lateral epicondylitis, but that it had not helped the numbness and tingling in her fingers.  On examination, plaintiff had tenderness along the common extensor origin of the right elbow, and pain with attempted pronation and supination of the forearm.  There was evidence of ulnar nerve subluxing and paresthesias along the ulnar nerve distribution of the hand.  Her intrinsic motor strength was normal, and x-rays of her elbow were grossly unremarkable (Tr. 191).

Plaintiff returned to Dr. Peele on November 17, 2000, for an injury to her right knee.  He immobilized her knee and noted she became fatigued with prolonged walking.  Dr. Peele found she

9

had reached maximum medical improvement with an 11 percent partial permanent impairment of the right lower extremity and a seven percent impairment of the left lower extremity (Tr. 190).

An Electromyography Report was done on November 28, 2000, and there was no evidence of right ulnar neuropathy across the elbow, forearm, or wrist segment. There was also no evidence of residual median neuropathy across the wrist (Tr. 188-189).

On December 12, 2000, plaintiff underwent surgery on her right elbow. The diagnosis was recalcitrant lateral epicondylitis and cubital tunnel syndrom with a subluxing ulnar nerve (Tr. 184-186).

At a followup appointment on January 3, 2001, Dr. Ugino assessed cubital tunnel syndrome and lateral epicondylitis. He indicated plaintiff needed to remain "out of work at this time" (Tr. 183).

On February 5, 2001, plaintiff presented to Dr. Ugino for a followup appointment. Dr. Ugino found plaintiff was "doing very well," that she was within five degrees of full extension of the elbow, and that her grip strength was excellent for being out of her cast for only four weeks. He stated her intrinsic and long flexor power was "excellent" (Tr. 177).

Subsequent electromyography results were normal and showed no evidence of right median neuropathy, normal sensory conduction, and normal motor conduction (Tr. 171).

On March 26, 2001, plaintiff returned to Dr. Ugino. He noted normal results of the electrodiagnostic tests of the hands. Plaintiff complained of "some discomfort and cramping" along the hand. Dr. Ugino stated he did not know the cause of her cramping and recommended a functional capacity evaluation of her right upper extremity (Tr. 170).

10

On April 30, 2001, Dr. Ugino noted plaintiff had regained "excellent strength and power to her hand". He assessed a three percent impairment of the right upper extremity, with a 10 percent grip strength impairment, for a 13 percent permanent partial impairment. Dr. Ugino noted the following:

> After going through the Functional Capacity Evaluation, the limited factor on her is that she has problems with her lower extremities and is being followed by Dr. Peele at this stage. However, she has reached maximum medical improvement as far as the upper extremity is concerned. She is able to lift 10 [pounds] with regards to her lower extremities, but as far as the upper extremity is concerned, she is able to use a palm sander on a swing at home, and she can do assembly activities while sitting and standing intermittently. She functions within the light to medium range category with respect to the upper extremity. I am releasing her from my office. I do not see any need for any further surgical intervention at this stage.

He noted plaintiff had cubital tunnel syndrome and lateral epicondylitis (Tr. 169).

On May 11, 2001, plaintiff returned to Dr. Peele complaining that she was walking but feeling sore, and that physical therapy had not helped her. Plaintiff stated the brace had hleped her left knee, as had swimming. Dr. Peele stated her examination was "not really consistent" with a meniscal tear. He prescribed Darvocet for pain, encouraged her to "swim a lot" and indicated he had nothing else to offer her (Tr. 167).

On September 13, 2001, plaintiff returned to Dr. Downie and reported that she continued to take Prozac and only took Xanax "rarely." She stated that overall she was doing "pretty well. On examination she was alert, oriented, and cooperative, with a euthymic mood and improved self esteem (Tr. 220-221).

On December 14, 2001, plaintiff presented to Edward Berg, M.D., for a consultative examination in connection with her application for benefits. He noted she used a cane in her right

11

hand. Plaintiff was five feet, seven inches tall and weighed 259 pounds. She walked with an antalgic gait to the left with a cane in the right hand. She was unable to squat, but she was able to walk on her heels and toes. She finished straight leg-raising tests at 90 degrees bilaterally, with some back pain on the left. She had marked tenderness of her lower back, and pain on flexion, extension and lateral bending. She had decreased range of motion in her left hip. She could bend her right knee from zero to 130 degrees and had no instability or effusion. She could bend her left knee from zero to 90 degrees with 2+ effusion but no instability. Her deep tendon reflexes were 2+ and symmetrical, and pinprick sensation was normal. Dr. Berg assessed bilateral trochanteric bursitis; degenerative arthritis of both knees, left greater than right; hip pain on range of motion related to the trochanteric bursitis and chronic back pain; exogenous obesity, and 10% decreased extension of the right elbow (Tr. 213-215).

On January 25, 2002, plaintiff presented to Thomas V. Martin, M.D., for a consultative psychiatric evaluation in connection with her application for benefits. Plaintiff complained of "chronic depression, [posttraummatic stress disorder (PTSD)], anxiety, and issues with anger." She reported eight psychiatric hospitalizations since the age of 18. She indicated she had taken Prozac for 13 years, and that it had been the most effective medication. She also reported receiving regular psychotherapy. Plaintiff reported PTSD symptoms since an alleged rape five years earlier. She further reported a history of mania and hearing voices on occasion. Dr. Martin noted she was "apparently" suffering from degenerative joint disease, bursitis, and fibromyalgia[3]. Plaintiff stated she helped with laundry and child care and indicated she could complete tasks, though not in a timely

---

[3]Defendant noted that there is no diagnosis or other mention of fibromyalgia in the plaintiff's medical records.

fashion. The examination revealed that plaintiff was alert, fully oriented, interactive, and pleasant. She exhibited normal speech, a full range of emotional expression, and goal-directed thoughts. She denied hallucinations or delusions. On cognitive examination, she successfully completed short-term memory, concentration, and mathematical exercises. She denied any active suicidal or homicidal ideations, plans, or intent. Dr. Martin assessed a moderate, severe and recurrent major depressive disorder, PTSD, degenerative joint disease, migraine headaches, bursitis, asthma, lower back pain and psychosocial stressors. He assigned a Global Assessment of Functioning (GAF) score of 55[4]. Dr. Martin indicated plaintiff would benefit from aggressive therapy and medical intervention, and that her medications could contribute to her depressive symptoms. He noted she was "motivated to retrain into an alternative employment position to reenter the work force" and indicted he expected fair to good results with adequate pain control (Tr. 216-219).

On January 28, 2002, a State Agency medical consultant reviewed plaintiff's records and completed a "Physical RFC Assessment" form. The physician determined plaintiff could lift 10 pounds occasionally and 10 pounds frequently, stand and/or walk at least two hours in an eight-hour day, and sit about six hours in an eight-hour workday, with minimal use of foot pedals. The physician found plaintiff could never climb ladders, but that she could occasionally do other climbing, as well as balancing, stooping, kneeling, crouching, and crawling (Tr. 274-281).

On February 4, 2002, State Agency psychologist Edward D. Waller, Ph.D., reviewed plaintiff's records and completed "Mental RFC Assessment" and "Psychiatric Review Technique" forms. Dr. Waller found plaintiff had "moderately limited" abilities to carry out detailed

---

[4]A GAF score of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th ed. 1994).

13

instructions, maintain attention and concentration for extended periods, complete a normal work-day and workweek without interruptions from psychologically-based symptoms and interact appropriately with the general public. He noted she could perform simple tasks for 2+ hours with no special supervision; that she would likely miss an occasional workday; that she could accept supervisory feedback; that she would need a job not requiring contact with the public; that she could make simple work-related decisions, request assistance, and use public transportation; and that she could adhere to basic standards of hygiene and safety. He assessed affective and anxiety-related disorders that produced "moderate" functional limitations (Tr. 256-273).

On March 6, 2002, plaintiff presented to Ezra B. Riber, M.D., an anesthesiologist and pain specialist for a consultative examination. Dr. Riber noted plaintiff had been in a "generally good state of health" prior to her October, 1999 knee injury. On examination, her lungs were clear, her heart rate was normal, and she had tenderness to firm palpation on her lower back. She had "moderate" trochanteric tenderness, and limited range of motion in her knees. She ambulated with a cane. Dr. Riber noted he needed to review her records further (Tr. 230-231).

Plaintiff returned to Dr. Riber on April 29, 2002. Her ordered additional tests and raised the possibility of total knee replacement surgery (Tr. 228-229).

On July 17, 2002, Dr. Riber again adjusted her medication and recommended cortisone injections (Tr. 226).

Plaintiff returned to Dr. Martin on September 27, 2002. He noted her depression seemed to be worsening. On examination, plaintiff was alert and fully oriented; she exhibited normal speech, a serious mood and a constricted affect. Her thoughts were goal-directed and coherent, and there was no evidence of deficits in memory or concentration. She denied active suicidal or homicidal

ideations, plans or intents.  Dr. Martin assessed moderate, recurrent, major depressive disorder, PTSD with partial improvement, a pain disorder with both psychological and medical components and a GAF score of 50[5].  He noted she would benefit from psychotherapy and ongoing medical support (Tr. 232-236).

On October 4, 2002, State Agency psychologist W. Pearce McCall, Ph.D., reviewed plaintiff's records and completed "Mental RFC Assessment" and "Psychiatric Review Technique" forms.  Dr. McCall determined plaintiff had "moderately limited" abilities to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal work-day and workweek without interruptions from psychologically-based symptoms, interact appropriately with the general public, respond appropriately to changes within the work setting, travel in unfamiliar places and set realistic goals.  He noted she seemed able to do simple tasks.  Dr. McCall assessed affective, somatoform and anxiety-related disorders that produced "moderate" functional limitations (Tr. 237-253).

On February 10, 2003, plaintiff returned to Dr. Ugino with reports of aching in her right arm. She had nearly full extension and flexion in her elbow, and there was no evidence of atrophy in the intrinsic hand muscles (Tr. 295).

Nerve conduction and EMG studies were "well within normal limits," and there was no evidence of right cervical radiculopathy, carpal tunnel syndrome, ulnar neuropathy or generalized polyneuropathy (Tr. 293).

---

[5]A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV, supra.

On June 18, 2003, Dr. Riber noted he could not offer plaintiff any specific interventional pain management procedures, other than cortisone injections, which were not recommended by the allergist. He recommended H-wave treatment and adjusted her medications (Tr. 287).

## VI. ARGUMENTS

As previously stated, plaintiff's argument consists of the following, quoted verbatim:

> The ALJ incorrectly determined that Ms. Jennings' allegations of disabling pain and limited functional capacity were not credible because Ms. Jennings' allegations are supported by the majority of medical and testimonial evidence in the record.

Plaintiff's brief, p. 3).

Specifically, plaintiff alleges that the ALJ disregarded her testimony concerning her inability to walk in a grocery store, stand for long periods of time, and her inability to sit for more than 15 minutes. Plaintiff also asserts that the ALJ erred in failing to find her testimony that her right leg goes numb and requires elevation to relieve pressure as credible. Plaintiff contends that her complaints of leg and hip pain are documented numerous times throughout her medical records, including recordation of chrondomalacia and trochanteric bursitis. Further, plaintiff asserts that MRI's and surgeries performed on plaintiff's knees also evidence the degenerative nature of both of Ms. Jennings' knees and is well documented throughout. (Tr. 176-194).

Additionally, plaintiff argues that the ALJ disregarded her complaints concerning loss of strength and mobility in her dominant arm and hand. (Tr. 311 and 317). Plaintiff testified that cooking was difficult as she dropped and/or cut herself trying to grip a knife. Plaintiff argues that her testimony concerning pain and loss of strength is supported by medically determined diagnoses of

cubital tunnel syndrome and lateral epicondylitis. (Tr. 183-187). Plaintiff asserts that it is "clear that the ALJ disregarded the overwhelming evidence of her inabilities concerning hip, back, and knee pain and the inability to use her dominant hand in his determination that plaintiff could perform sedentary work." (Plaintiff's brief).

Plaintiff also argues that the hypothetical posed by the ALJ to the VE did not take into consideration plaintiff's limitations concerning elevation of her legs to relieve pressure and the loss of strength and mobility in her dominant hand. Plaintiff asserts that the ALJ erred in determining that she could perform sedentary work and that she was capable of performing work as either an office helper, hand trimmer, or nut sorter. Plaintiff contends that the repetitive and fine manipulative use of plaintiff's hands is impossible as well and the numerous surgeries and chronic pain her treating physicians describe in their reports fully substantiate these claims.

Defendant asserts that plaintiff's argument that the ALJ erred by not finding her subjective complaints of pain and other limitations fully credible lacks merit. Defendant argues that the ALJ considered the evidence as a whole and concluded plaintiff's testimony was not fully credible.

In assessing complaints of pain, the ALJ must (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). A claimant's allegations of pain itself or its severity need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain,

are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

As to allegations of pain, the Fourth Circuit has often repeated that, "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain, such as heat, swelling, redness and effusion." Craig, 76 F.3d at 592 (identifying two-step process by which ALJ must first determine if the claimant has demonstrated by objective medical evidence an impairment capable of causing the pain alleged and if so, must then assess the credibility of the claimant's subjective accounts of pain); Jenkins v. Sullivan, 906 F.2d 107, 109 (4th Cir. 1990).

The Commissioner has promulgated Ruling 96-7p to assist ALJs in determining when credibility findings about pain and functional effect must be entered, and what factors are to be weighed in assessing credibility.  The Ruling directs that,

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.
>
> . . .
>
> An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

18

. . .

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Ruling 96-7p.

The ALJ cited numerous reasons for not finding the plaintiff's complaints of pain credible.

As further explained below, the ALJ's credibility determination is supported by substantial evidence.

The ALJ considered objective medical evidence and stated the following in his findings, quoted verbatim, in part:

> At the hearing, the claimant testified that she hurt her knee while working and that all her doctors stated that she was unable to work. She stated that she could not return to work because the medication limited her mental clarity and she had a poor memory. She stated that both of her knees give away. She stated that activity caused pain. The claimant stated that she cannot walk in a grocery store, reach up, stand for prolonged periods, and 98% of the time she had to lie down. She stated that she cannot stand over fifteen minutes. She testified that she sits with her legs elevated to take the pressure off. She stated that sitting causes her right leg to go numb.

> The record reveals that the claimant's daily questionnaire dated October 24, 2001, indicated that the claimant could do the laundry occasionally, dust, and sweep. She stated that she could do yarn work and enjoyed going to the movies. The claimant report of contact dated

November 20, 2001, indicated that the claimant was not depressed often. She stated that she experienced episodes of depression before she began to take Prozac. The undersigned does not doubt that the claimant has experienced some form of pain and discomfort, but such has not been proven to be of disabling proportions. Hence, the undersigned concludes that the claimant's testimony is not credible.

Accordingly, the undersigned finds that claimant retains the following residual functional capacity to perform sedentary exertional level work involving no standing and/or walking over prolonged hours in an eight-hour workday and simple routine work with one or two step instructions. The claimant must have no interaction with the public or co-workers. The claimant must perform no crawling, balancing or climbing of ladders or scaffolds. The claimant must not use foot pedals or other controls and should avoid hazards such as heights, vibrations, and dangerous machinery.

The medical evidence indicates that the claimant's mental impairments, as considered under section 12.04 and 12.06 of the Listing, results in moderate restriction of activity of daily living and moderate difficulties in maintaining social functioning. She has experienced moderate deficiencies of concentration, persistence, and pace and no episodes of decompensation.

(Tr. 16).

The undersigned notes that the ALJ concluded that plaintiff has a moderate restriction of activity of daily living and moderate difficulties in maintaining social functioning. The ALJ found that plaintiff has experienced moderate deficiencies of concentration, persistence, and pace with no episodes of decompensation. As to plaintiff's RFC, the ALJ found that plaintiff could perform simple routine work with one or two step instructions and must have no interaction with the public or co-workers. Therefore, the ALJ considered plaintiff's mental impairments.

As to plaintiff's argument that the ALJ erred in not finding her testimony credible with regards to pain and numbness in her hand and arm, the objective medical evidence does not support her allegations. On December 12, 2000, plaintiff underwent surgery on her right elbow and on

February 5, 2001, Dr. Ugino noted plaintiff was doing very well and was within five degrees of full extension of the elbow and her grip strength was excellent for being out of her cast only four weeks. On March 5, 2001, Dr. Ugino assessed plaintiff with carpal tunnel syndrome and lateral epicondylitis along with cubital tunnel syndrome and recommended further electrodiagnositic tests. (Tr. 171). Subsequent tests were normal with no evidence of right median neuropathy, normal sensory conduction, and normal motor conduction. (Tr. 171). By April 30, 2001, Dr. Ugino noted plaintiff had regained "excellent strength and power to her hand."  (Tr. 169). Dr. Ugino assessed a three percent impairment of the right upper extremity, with a 10% grip strength impairment. As to her upper extremities, Dr. Ugino noted that "she is able to use a palm sander on a swing at home and can do assembly activities while sitting and standing intermittently." (Tr. 169). On February 10, 2003, plaintiff returned to Dr. Ugino complaining of aching in her right arm but he noted that she had nearly full extension and flexion in her elbow and no evidence of atrophy in the intrinsic hand muscles. (Tr. 295). Nerve Conduction and EMG studies were "well within normal limits," and there was no evidence of right cervical radiculopathy, carpal tunnel syndrome, ulnar neuropathy or generalized polyneuropathy. (Tr. 293). It is also noted that in the hypothetical to the VE, the ALJ noted that the individual would not be required to operate any foot pedals or controls. Therefore, based on the medical evidence in the record, the ALJ's assessment of plaintiff's testimony and allegations was not in error.

Plaintiff argues that the ALJ erred in disregarding her testimony "concerning her inability to walk in a grocery store, stand for long periods of time, and inability to sit for more than 15 minutes. She also testified that her right leg goes numb and requires elevation to relieve pressure." (Plaintiff''s brief p. 3).  Defendant argues that the ALJ gave plaintiff every benefit of the doubt in limiting her

to sedentary work that would not require prolonged standing or walking, no climbing, working at heights, working around dangerous or moving machinery and would not require operation of any foot pedals or controls.

A review of the transcript of record reveals that even when plaintiff's attorney added to the hypothetical that she could only stand for 15 minutes and has to use a cane, it did not eliminate the sedentary jobs according to the VE testimony. (Tr. 332). The ALJ did not find plaintiff's testimony credible that she had to elevate her legs and plaintiff has not pointed to any objective medical evidence from a physician stating that she was instructed to elevate her legs. However, the VE also testified that two of the jobs he listed, nut sorter and hand trimmer, could be performed using a stool or standing and remaining in the workstation. (Tr. 333).

Based on the above, the undersigned finds that the ALJ's evaluation of plaintiff's subjective complaints of pain complies with the Fourth Circuit precedent and the Commissioner's regulations and is supported by substantial evidence. Thus, the undersigned finds that there was substantial evidence to support the ALJ's finding that the plaintiff's impairments did not prevent her from performing the residual functional capacity of sedentary work

It appears that within plaintiff's argument concerning the ALJ failing to find her testimony totally credible, plaintiff argues that the ALJ failed to consider the combined effects of all of claimant's impairments. Plaintiff argues that " a review of the record shows that Ms. Jennings' activities are severely limited by her chronic pain. Ms. Jennings stated in her daily activities report that she needed assistance getting in and out of the shower and even washing on a daily basis. She also stated that the movies was a hobby however she was unable to sit in church seats or movie seats

without pain." (Plaintiff's brief). Plaintiff asserts that the ALJ disregarded plaintiff's inabilities and determined that because plaintiff once enjoyed the movies her claims were not credible.

Defendant agues that the ALJ expressly considered the medical evidence from plaintiff's treating and examining physicians and psychologists with regard to her general condition, as well as non-medical evidence, including the testimony of plaintiff, her lay witness and the VE. Defendant asserts that the ALJ took into account plaintiff's history of surgery, knee pain and weakness, upper extremity symptoms, back pain, trochanter bursitis, degenerative arthritis, major depressive disorder, PTSD, anxiety, pain disorder, cubital tunnel syndrome, carpal tunnel syndrome, chondromalacia and lateral epicondylitis. (Tr. 14-15). Defendant further asserts that the ALJ considered the fact that none of plaintiff's physicians ever opined she was permanently disabled from her physical or mental impairments, and he considered evidence of plaintiff's general physical and mental functional capacities.

In evaluating a claim for disability insurance benefits, the Commissioner is required to consider the combined effects of a claimant's impairments, and she must adequately explain her evaluation of the combined effects of those impairments. Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989); Reichenbacher v. Heckler, 808 F.2d 309,312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423 (d)(2)(c) (1982), and a general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987).

In addition, the Secretary is required to analyze two issues. He must first consider the combined effects of a claimant's impairments, and then he must adequately explain his evaluation

23

of the combined effect of those impairments.  Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989), and

Reichenbacher v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985).  These factors are mandated by

Congress' requirement that the Secretary consider the combined effect of an individual's

impairments, 42 U.S.C. § 423(d)(2)(c) (1982), and general requirement by the courts that an ALJ

explicitly indicate the weight given to all relevant evidence, Murphy v. Bowen, 810 F.2d 433, 437

(4th Cir. 1987).  See also, Hines, supra.  In the Hines case, the plaintiff was within a few pounds of

meeting the listing for disability due to obesity.  Yet the ALJ found that despite her obesity and

several other impairments, she was not disabled.  Without specifically finding disability, the Fourth

Circuit Court of Appeals remanded the case because the ALJ had failed to "explicitly indicate" the

weight given to the evidence in the case, and the combination of the plaintiff's impairments.

In the present case, the ALJ found that "the medical evidence indicates that the claimant has

meniscus tear, chondromalacia, problems with both hips, back problems, carpal tunnel syndrome,

fibromyalgia, depression, and anxiety, impairments that are severe within the meaning of the

Regulations, but not severe enough to meet or medically equal one of the impairments listed in

Appendix 1, Subpart P, regulations No. 4."  (Tr. 15). "Although claimant is severely impaired, the

undersigned finds that she has no impairments which, either alone or in combination, meets the

criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 CFR Part

404, Subpart P. Appendix 1)." (Tr. 24). The ALJ discussed plaintiff's medicals including her mental

impairments. (Tr. 16).

Based on the hearing decision and the medical evidence, it is discernible that the ALJ

considered the physical and mental evidence, the medical record and the level of the plaintiff's

activity, to indicate that the combination of the plaintiff's impairments did not indicate that the plaintiff was totally disabled from all work activity.

## VIII.  CONCLUSION

Despite the plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, this court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed. Therefore, it is

RECOMMENDED that the Commissioner's decision be AFFIRMED.

Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 26, 2005
Florence, South Carolina




**The parties' attention is directed to the important notice on the next page.**

25

### Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"
### &
### The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503
